PACIFIC TRIAL ATTORNEYS
A Professional Corporation
Scott J. Ferrell, Bar No. 202091
sferrell@pacifictrialattorneys.com
4100 Newport Place Drive, Ste. 800
Newport Beach, CA 92660
Tel: (949) 706-6464
Fax: (949) 706-6469

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

CIEARA MUNOZ, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

SHARPSPRING INC., a Delaware corporation d/b/a SHARPSPRING.COM;

Defendant.

Case No. '23CV1130 JES BLM

**CLASS ACTION COMPLAINT FOR VIOLATION OF THE VIDEO PROTECTION PRIVACY ACT**

## I. INTRODUCTION

Defendant has secretly installed spyware on its website at www.sharpspring.com. The spyware allows Defendant to de-anonymize and "dox" every visitor to the site – so that Defendant (1) knows each visitor's name, face, location, e-mail, and browsing history; and (2) shares that information with a Spyware company and others. Indeed, the Spyware company boasts that it transforms visitors who want to remain anonymous into "actionable sales leads in real-time."

Plaintiff anonymously visited Defendant's website, watched a video there, and communicated with Defendant. Defendant used the spyware to reveal Plaintiff's identity and then shared Plaintiff's video watching history and other of the other details of Plaintiff's visit with the Spyware company.

Defendant profits from the scheme by transforming Plaintiff from an anonymous visitor to an "actionable sales lead", while the Spyware company profits by adding Plaintiff's identity and PII to its proprietary marketing database that it sells to other companies that install its spyware.

Defendant's actions are illegal, intrusive, and offensive.

## II. JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because: (1) one of Plaintiff's claims arise under the VPPA, a federal law; (2) the amount in controversy greatly exceeds $5 million in the aggregate and there is minimal diversity between the parties, creating jurisdiction under the Class Action Fairness Act; and (3) the federal claim and the other claims arise out of a "common nucleus of operative fact" such that the Court may exercise supplemental jurisdiction over all claims pled herein in accordance with *United Mine Workers v Gibbs*, 383 US 715 (1966).

2. Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the acts and events giving rise to the class claims occurred in this District. Many class members reside in this District.

3. Defendant is subject to jurisdiction under California's "long-arm" personal jurisdiction statute because the exercise of jurisdiction over Defendant is not "inconsistent with the Constitution of this state or the United States." Indeed, Plaintiff believes that Defendant generates a minimum of eight percent of its national sales to Californians and that the website operates as a "gateway" for many such sales, such that the website "is the equivalent of a physical store in California." Since this case involves illegal conduct emanating from Defendant's operation of its website targeting Californians, California courts can "properly exercise personal jurisdiction" over the Defendant in accordance with the Court of Appeal opinion in *Thurston v. Fairfield Collectibles of Georgia*, 53 Cal.App.5th 1231 (2020).

## III. PARTIES

4. Plaintiff is a resident of California. Plaintiff is also a consumer privacy advocate who works as a "tester" to ensure that companies abide by the privacy obligations imposed by federal law. As an individual who advances important public interests at the risk of vile personal attacks, Plaintiff should be "praised rather than vilified." *See Murray v. GMAC Mortgage Corp.*, 434 F.3d 948, 954 (7th Cir. 2006). Indeed, the Ninth Circuit recently made exceptionally clear that it is "necessary and desirable for committed individuals to bring serial litigation" to enforce and advance consumer protection statutes, and that Courts must not make any impermissible credibility or standing inferences against them. *See Langer v. Kiser*, 57 F.4th 1085, 1095 (9th Cir. 2023).

5. Defendant is a Delaware corporation that operates an email marketing platform that provides marketing automation tools. The Website is widely available throughout the United States and in this District.

## IV. PARTIES

### A. The Right to Online Anonymity.

6. Courts recognize the right to online anonymity. *In Re Anonymous Online Speakers*, 661 F.3d 1168 (9th Cir. 2011). Indeed, the "free exchange of ideas on the

Internet is driven in large part by the ability of Internet users to communicate anonymously." *Doe v. 2TheMart.com Inc.*, 140 F. Supp. 2d 1088, 1093 (W.D. Wash. 2001).

7. According to Pew Research Center nearly all Americans believe it is important to be "in control of who can get information" about them; to not be tracked without their consent; and to be in "control[] of what information is collected about [them]." Accordingly, most people don't want their private online browsing to be associated with their public offline identities. This is because online anonymity gives the freedom to investigate, explore, and research without fear of social repercussions. Common examples include individuals with sensitive medical conditions, those struggling with sexuality, mental health issues, or even purchasing decisions.

8. In addition, online anonymity helps prevent security breaches, surveillance and intrusive web-tracking.

**B. The Business of Doxing.**

9. In simple terms, de-anonymization (commonly referred to as "doxing" or "fingerprinting") is a process that involves cross-referencing anonymized data with publicly-available information to reveal an individual's identity.

10. Companies would secure huge marketing advantages if they knew the identities and contact information of individuals who visited their website, as they could then bombard those individuals with relentless targeted marketing. Fortunately, numerous privacy laws are intended to prevent this.

11. A spyware company called Lead Forensics ("LF") describes itself as "the world's #1 website visitor identification software." LF's software "reveals the identity of your anonymous website visitors, turning them into actionable sales-ready leads in real-time." *See* https://www.leadforensics.com/ (last downloaded June 2023).

12. LF boasts that it can "reveal the identity of your anonymous website traffic and turn them into actionable sales leads in real-time" and that it "gives you access to that

power by revealing the identity of your previously unknown website visitors." *See* https://www.leadforensics.com/how-it-works/ (last downloaded June 2023).

13. LF sells businesses a small tracking code to place on their websites, enabling them to identify website visitors' IP addresses and related data and transmit that data to LF. LF then matches the identified IP address and related data to a global proprietary database of information to de-anonymize website visitors, and provides its clients with each anonymous user's name, picture, e-mail, and telephone number. *See* https://www.leadforensics.com/how-it-works/ (last downloaded June 2023).

14. LF's purpose is to build massive repositories of the most current information available about the people using its customers' websites. LF secretly collects and analyzes real-time information about everyone engaging on those platforms and on third-party platforms. This results in LF collecting and selling information about activity that users could not expect to be gathered or sold.

15. The below screenshot from Leadforensics.com shows a visual depiction of how it what LF does for its clients:



**C. Defendant's Purchase and Use of LeadForensics Spyware.**

16. Defendant purchased and installed LF's spyware on its website to enable Defendant to secretly de-anonymize and dox website visitors including Plaintiff (identifying them by name, picture, e-mail address, and telephone).

17. The below exemplars show how Defendant shares data about each visitor back and forth with LeadForensics, including the device being used by a visitor:

**FIGURE 1**



Headers Preview Response Initiator Timing Cookies

| Name | Value | Domain | P... | Expir... | Size | H. | S. | S. | P. | Pri... |
|---|---|---|---|---|---|---|---|---|---|---|
| cookielawinfo-checkbox-n... | yes | www.leadforensics.com | / | 2024... | 35 | | | | | Medi... |
| cookielawinfo-checkbox-fu... | no | www.leadforensics.com | / | 2024... | 35 | | | | | Medi... |
| cookielawinfo-checkbox-p... | no | www.leadforensics.com | / | 2024... | 36 | | | | | Medi... |
| cookielawinfo-checkbox-a... | no | www.leadforensics.com | / | 2024... | 34 | | | | | Medi... |
| cookielawinfo-checkbox-a... | no | www.leadforensics.com | / | 2024... | 38 | | | | | Medi... |
| cookielawinfo-checkbox-ot... | no | www.leadforensics.com | / | 2024... | 31 | | | | | Medi... |
| _gcl_au | 1.1.180724767.1686792069 | .leadforensics.com | / | 2023... | 31 | | | | | Medi... |
| _gid | GA1.2.1179796746.1686792069 | .leadforensics.com | / | 2023... | 31 | | | | | Medi... |
| slireg | https://scout.us4.salesloft.com | www.leadforensics.com | / | 2023... | 37 | | | | | Medi... |
| sliguid | b3955b27-91fa-4924-83cd-79197a901d59 | www.leadforensics.com | / | 2024... | 43 | | | | | Medi... |
| slirequested | true | www.leadforensics.com | / | 2024... | 16 | | | | | Medi... |
| ln_or | eyI2ODM2MjAiOiJkIn0%3D | www.leadforensics.com | / | 2023... | 27 | | | | | Medi... |
| _fbp | fb.1.1686792069635.1057544567 | .leadforensics.com | / | 2023... | 33 | | | | | Medi... |
| __adroll_fpc | 47f39b1724b02a2874f97f5ecdb027c1-1686792... | .www.leadforensics.com | / | 2024... | 58 | | | | | Medi... |
| __zlcmid | 1GNltguAnhFfREd | .leadforensics.com | / | 2024... | 23 | | | | | Medi... |
| _ga_RRXNYM6QGE | GS1.1.1686792069.1.1.1686792103.0.0.0 | .leadforensics.com | / | 2024... | 51 | | | | | Medi... |
| _ga | GA1.1.287158838.1686792069 | .leadforensics.com | / | 2024... | 29 | | | | | Medi... |
| _ga_M827Q9YV22 | GS1.1.1686792069.1.1.1686792103.26.0.0 | .leadforensics.com | / | 2024... | 52 | | | | | Medi... |
| _ga_796TF7VE50 | GS1.1.1686792069.1.1.1686792103.0.0.0 | .leadforensics.com | / | 2024... | 51 | | | | | Medi... |
| __ar_v4 | SZLPIGEULREWTDOPRTLYO5%3A20230615%... | .www.leadforensics.com | / | 2024... | 84 | | | | | Medi... |

**FIGURE 2**



| Name | Value | Domain |
|---|---|---|
| _ga_RRXNYM6QGE | GS1.1.1686792069.1.1.1686792103.0.0.0 | .leadforensics.com |
| _ga_798TF7VE50 | GS1.1.1686792069.1.1.1686792103.0.0.0 | .leadforensics.com |
| _ga | GA1.1.287158838.1686792069 | .leadforensics.com |
| __zlcmid | 1GNltguAnhFfREd | .leadforensics.com |
| _gid | GA1.2.1179796746.1686792069 | .leadforensics.com |
| _fbp | fb.1.1686792069635.1057544567 | .leadforensics.com |
| _ga_M827Q9YV22 | GS1.1.1686792069.1.1.1686792103.26.0.0 | .leadforensics.com |
| _gcl_au | 1.1.180724767.1686792069 | .leadforensics.com |

**FIGURE 3**

| ▾ Request Headers | ☐ Raw |
| --- | --- |
| Accept: | */* |
| Accept-Encoding: | gzip, deflate, br |
| Accept-Language: | en-US,en;q=0.9 |
| Connection: | keep-alive |
| Host: | secure.leadforensics.com |
| Referer: | https://sharpspring.com/ |
| Sec-Ch-Ua: | "Not.A/Brand";v="8", "Chromium";v="114", "Google Chrome";v="114" |
| Sec-Ch-Ua-Mobile: | ?0 |
| Sec-Ch-Ua-Platform: | "macOS" |
| Sec-Fetch-Dest: | script |
| Sec-Fetch-Mode: | no-cors |
| Sec-Fetch-Site: | cross-site |
| User-Agent: | Mozilla/5.0 (Macintosh; Intel Mac OS X 10_15_7) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/114.0.0.0 Safari/537.36 |

**D. The Video Privacy Protection Act.**

18. The Video Privacy Protection Act of 1988 (18 U.S.C. § 2710) ('VPPA') regulates the disclosure of information about consumers' consumption of video content. The VPPA prohibits businesses that deliver "video cassette tapes or similar audio visual materials" from "knowingly disclosing, to any person, personally identifiable information concerning any consumer of such provider. . . .". 18 U.S.C. § 2710(a)-(b).

19. Indeed, the Harvard Law Review approvingly summarizes the VPPA as follows:

> *In the United States' patchwork privacy regime, the VPPA is a unique gap-filler, extending protection to the expressive activities recognized as vital to the First Amendment but left underprotected by the Fourth. This Chapter argues that technological and doctrinal changes have done less damage to the Video Privacy Protection Act than one might expect. . .The VPPA and recent cases deploying the Act suggest that courts are not hesitant to recognize privacy harms as "injuries" when the harms implicate intellectual privacy. Because of its broad, technology-neutral language, the VPPA has managed to weather the past forty years. Though the statute's effectiveness, like that of any other statute, depends on reasonable judicial interpretation, the VPPA's resilience despite technological and doctrinal changes indicates that the statute might prove an appropriate model for the next logical step in safeguarding the privacy of expressive activity: federal reader privacy legislation.*

*The Video Privacy Protection Act as a Model Intellectual Privacy Statute*, 131 Harv. L. Rev. 1766 (April 2018).

**E. Defendant is a Video Tape Services Provider under the VPPA.**

20. Defendant advertises video content on its website and encourages visitors to its website to watch the video content that Defendant hosts there:

**FIGURE 4**




21. Defendant is substantially involved in the creation and distribution of video content to visitors to its website. As shown above, the video content is uniquely tailored to serve several core purposes of Defendant's business such as promoting brand awareness, encouraging visitors to use and purchase Defendant's products, and encouraging visitor engagement with Defendant's website.

22. The use of website videos is an integral part of Defendant's business, and the creation, editing, and distribution of such videos is a significant part of Defendant's core operations.

23. Based on the preceding facts, Defendant is a "video tape service provider" as defined by the VPPA. Indeed, multiple courts have held that companies that deliver audiovisual content over the internet are subject to the VPPA. *See, e.g.*, *Belozerov v. Gannett Co., Inc.*, - F. Supp. 3d -, 2022 WL 17832185, at *3 (D. Mass. Dec. 20, 2022); *Czarnionka v. The Epoch Times Ass'n, Inc.*, 2022 WL 17069810, at *4 (S.D.N.Y. Nov. 17, 2022) (websites that noting complaint's allegation that owner/operator of theepochtimes.com delivers audiovisual materials including "news programs, television shows, documentaries, movies, and other audiovisual content"); *Lebakken v. WebMD, LLC*, 2022 WL 16716151, at *1, *3 & n.2 (N.D. Ga. Nov. 4, 2022) (noting allegation that

owner/operator of WebMD.com provides "online health information and medical news"); *Ambrose v. Boston Globe Media Partners LLC*, 2022 WL 4329373, at *2 (D. Mass. Sept. 19, 2022) (noting allegation that bostonglobe.com "is engaged in the business of delivering various types of video content"); *Cappello v. Walmart Inc.*, 2019 WL 11687705, at *2 (N.D. Cal. Apr. 5, 2019) (Seeborg, J.) (denying motion to dismiss regarding walmart.com); *In re Hulu Privacy Litig.*, 2012 WL 3282960 at *6 (rejecting argument that VPPA does not cover streaming service purportedly because VPPA does not expressly cover digital distribution).

**F. Plaintiff is a Both a "Consumer" and a "Subscriber" Under the VPPA.**

24. The VPPA defines the term "consumer" to mean "any renter, purchaser, or subscriber of goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1) (emphasis added).

25. Plaintiff watched a video titled ***"SharpSpring Marketing Automation and CRM"*** in 2023 on Defendant's website at the link https://sharpspring.com/.

26. Plaintiff has downloaded Defendant's "app" onto Plaintiff's smart phone. As such, Plaintiff is also a "subscriber" under the VPPA. As explained by the Eleventh Circuit, "payment is not a necessary element of subscription." *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256 (11th Cir. 2015) (holding that subscribing to free periodicals, newsletters, blogs, videos, and other services qualifies as "subscriber" under the VPPA. *8); *see also Belozerov*, 2022 WL 17832185, at *3 (no payment necessary to qualify as a subscriber under the VPPA); and *Yershov v. Gannett Satellite Info Network, Inc.*, 820 F.2d 482, 487 (1st Cir. 2016) ("we decline to interpret the statute as incorporating monetary payment as a necessary element").

**G. Defendant Knowingly Revealed Plaintiff's Personally Identifying Information to LeadForensics.**

27. The VPPA defines "personally identifiable information" or "PII" as "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

28. Defendant chose to install LF on its website to de-anonymize visitors to create “actionable sales leads.” As part of that agreement, Defendant installed LF’s tracking software on its website. As part of that software as shown above, Defendant reports to LF a collection of cookies that allows LF to identify a particular visitor by name, address, and location and match it to their viewing habits.

29. The below exemplars show how Defendant reports both the title of videos viewed, along with the _Gid cookie that allows Google to identify every consumer by name, as well as corresponding visitor PII to LeadForensics:

30. Defendant has configured a Google Analytics event to trigger whenever a user clicks to view the video on their website.

**FIGURE 5**




31. When the video is played, the event triggers and a report is sent by Defendant website to Google, informing Google that the user has viewed the video and discloses the video title, video URL, and the user’s _gid cookie.




32. The _gid cookie submitted is a unique personal identification number assigned to the user's Google account. This data is stored on the browser and readily accessible by the Defendant's website.



| Name | Value | Domain |
|---|---|---|
| _gid | GA1.2.1515767310.1686796018 | .sharpspring.com |

33. The _gid cookie stored from the website on the browser matches the _gid submitted to Google.

34. Defendant's reporting to LF readily permits an ordinary person to identify a particular individual's video-watching behavior. In summary, Defendant knowingly does precisely what VPPA prohibits: specifically, it discloses to third parties the personally identifiable information (PII) of consumers derived from their video viewing habits, along with the title of any videos viewed by particular consumers. It does so secretly and without users' effective consent. Defendant's conduct is illegal, offensive, and contrary to visitor expectations.

## V. CLASS ALLEGATIONS

35. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

**Count 1 for VPPA: All persons in the United States who watched a video on Defendant's website and whose PII was disclosed by Defendant to any third party during the two years preceding the filing of this action (the "Class Period").**

**All other Counts: All California residents who while within California communicated with Defendant via its website and whose PII was disclosed by Defendant to any third party during the two years preceding the filing of this action (the "Class Period").**

36. Numerosity: At this time, Plaintiff does not know the exact number of members of the aforementioned Class. However, given the popularity of Defendant's website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

37. Commonality and Predominance: There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

a) whether Defendant is a VTSP under the VPPA;

b) whether class members are "consumers" under the VPPA;

c) whether Defendant knowingly disclosed class members' PII; and

d) whether Defendant's disclosures were committed knowingly.

38. Typicality: Plaintiff's claims are typical of those of the Class because Plaintiff visited the Website to play videos, and had PII collected and disclosed by Defendant.

39. Adequacy: Plaintiff has retained qualified and competent counsel who are highly experienced in complex consumer class action litigation. Moreover, Plaintiff is able to fairly and adequately represent and protect the interests of the Class.

40. Superiority: A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Class is impracticable. Even if every member of the Class could afford to pursue individual litigation, the court system could not. Plaintiff anticipates no difficulty in the management of this action as a class action.

## VI. V. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT

### 18 U.S.C. § 2710, *et seq.*

41. Defendant is a "video tape service provider" under the VPPA as set forth above. *See* 18 U.S.C. § 2710(a)(4) (emphasis added).

42. Plaintiff and members of the Class are "consumers" and "subscribers" as set forth above. *See* 18 U.S.C. § 2710(a)(1) (emphasis added).

43. Defendant disclosed Class members' PII to Google as set forth above.

44. Defendant did so knowingly as set forth above.

45. Defendant did so without informed, effective consent as set forth above.

46. For violating the VPPA, Defendant is liable for (1) statutory damages in the amount $2,500 per violation; (2) punitive damages; and (3) recovery of attorneys' fees. *See* 18 U.S.C. § 2710(c).

### SECOND CAUSE OF ACTION

### CALIFORNIA INVASION OF PRIVACY

47. Article I, § 1 of the California Constitution provides, "All people are by nature free and independent and have inalienable rights. Among those are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

48. The phrase "and privacy" was added by an initiative adopted by California voters on November 7, 1972 (the Privacy Initiative). The Privacy Initiative created a private right of action against nongovernmental entities for invasions of privacy.

49. The California Supreme Court has explained that one of the principal "mischiefs" to which the Privacy Initiative was directed was "the overbroad collection and retention of unnecessary personal information by government and business interests." *White v. Davis*, 13 Cal.3d 757, 775 (Cal. 1975).

50. Defendant's conduct in doxing plaintiff and sharing and monetizing Plaintiff's personal information violates Plaintiff's right to privacy.

51. Defendant created a detailed dossier of the personal information of Plaintiff and then shared it with LeadForensics and Google, which then sold it and shared it with numerous companies to profit and assist those other companies in creating their own separate dossiers about Plaintiff.

52. Plaintiff has the right to privacy in plaintiff's web-browsing history; in how personal information is going to be used; in the right to withhold and not disclose personal information, and all statutory privacy rights codified under federal and California law.

53. Defendant has intruded on these privacy interests.

54. Defendant's actions constitute a serious invasion of privacy in that it violates several federal laws, including the Electronic Communications Privacy Act; violates state criminal laws; violates the right to privacy located in the First Amendment of the United States Constitution; invaded the privacy rights of plaintiff; disclosed sensitive personal information related to the verticals alleged above; facilitated the disclosure of Plaintiff's information by third parties who did not have legal access to their personal information.

55. Defendant acted with oppression, fraud, or malice in invading Plaintiff's privacy.

56. Plaintiff has been damaged by Defendant's invasion of privacy and is entitled to just compensation in the form of actual damages, general damages, and punitive damages.

## THIRD CAUSE OF ACTION

## INTRUSON UPON SECLUSION

57. A claim for intrusion upon seclusion requires (1) intrusion into a private place, conversation, or matter; (2) in a manner highly offensive to a reasonable person.

58. Defendant intentionally intruded upon Plaintiff's solitude or seclusion by (1) monetizing Plaintiff's personal information without consent, and (2) by mining and distributing data that in connection with LF.

59. Defendant intentionally intruded upon the Plaintiff's solitude or seclusion by facilitating cookie-matching with LF as alleged herein.

60. Cookie matching enabled companies with limited information about Plaintiffs and other Class Members to accumulate substantially more information about each individual Plaintiff and Class Member.

61. Defendant intentionally intruded upon the Plaintiffs' and Class Members' solitude or seclusion by selling and sharing Plaintiffs' and Class Members' sensitive personal information for purposes of targeted advertising and publicized sensitive information to hundreds of other companies.

62. None of Defendant's actions were authorized by Plaintiff.

63. Defendant violated federal and state criminal and civil laws designed to protect individual privacy and against theft.

64. It is highly offensive to a reasonable person that Defendant collected information to de-anonymize Plaintiff and share it with hundreds of unknown companies without consent.

65. It is also highly offensive Defendant worked with LF to share personal information about Plaintiff such as an individual's race, ethnicity, religion, health, and financial status.

66. It was highly offensive to a reasonable person for Defendant to intrude into Plaintiff's personal information, Internet communications, and computing devices.

67. Defendant has acted with oppression, fraud, or malice.

68. Plaintiff is entitled to just compensation in the form of actual damages, general damages, unjust enrichment, nominal damages, and punitive damages under this cause of action.

**FOURTH CAUSE OF ACTION**

**PUBLICATION OF PRIVATE INFORMATION**

69. Plaintiff's personal information, including sensitive data and Internet communications, are private facts that Defendant was not authorized to collect or sale.

70. Defendant publicized Plaintiff's private facts and the content of plaiintiff's Internet communications by sharing with LF, Google, and in turn hundreds of different companies.

71. Defendant and those companies profit from acquiring personal information and creating vast and rich dossiers to both target advertising and to further sell the personal information to other third parties.

72. Plaintiff did not know that Defendant shared or sold personal information and did not consent to such publication.

73. It is highly offensive to a reasonable person that Defendant sold and shared personal to LF and by extension to hundreds of different advertising companies.

74. Defendant acted with oppression, fraud, or malice.

75. Plaintiff has been damaged by the publication of their private information and are entitled to just compensation in the form of actual damages, general damages, unjust enrichment, nominal damages, and punitive damages.

**FIFTH CAUSE OF ACTION**

**CALIFORNIA INVASION OF PRIVACY ACT**

76. Defendant aided and abetted LF to read and use the contents or meaning of the communications being exchanged connected to Plaintiff by selling and sharing that information with LF. Defendant did so while the information was still in transit or being sent or received.

77. Plaintiff did not consent to Defendant's actions.

78. The cookies used were "machine[s], instrument[s], or contrivance[s]" under § 631(a). 206.

79. Plaintiff suffered loss by reason of these violations, including, but not limited to, violation of plaintiff's rights to privacy and loss of value in personal information.

80. Plaintiff is entitled to damages of $5,000 as well as injunctive relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks judgment against Defendant as follows:

a. For appropriate class certification orders;

b. For all relief available under each claim, including without limitation statutory damages, punitive damages, and attorneys' fees;

c. For any and all other relief, at law or equity, that may be appropriate.

Dated: June 15, 2023

PACIFIC TRIAL ATTORNEYS, APC

By:____________________
Scott. J. Ferrell
Attorneys for Plaintiff